# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAMES HARVELL, | |
|     Plaintiff, | |
|     v. | No. 05 C 0127<br>Judge James B. Zagel |
| JO ANNE B. BARNHART, Commissioner<br>of Social Security, | |
|     Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Harvell seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner"), who determined that he was not entitled to Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Harvell raises several objections to the decision of the Administrative Law Judge (the "ALJ") to deny benefits and argues that the ALJ's decision was not supported by substantial evidence. The Commissioner seeks summary judgment of Harvell's claim.

Harvell suffered a traumatic brain injury, resulting in an extended coma, when he was eight years old. Residual effects of the injury include cognitive deficits, left-sided hemiparesis and petit mal seizures. Harvell was also diagnosed and treated for depression.[1] Harvell, who is now 28, lives with his former foster mother. He has a high school education and has worked in the past as a janitor, dishwasher and hand-packager.

---

[1] Harvell was found disabled on the basis of these impairments under the childhood disability standard. He received benefits until March 2000, when the benefits were terminated, possibly due to work activity.

Harvell filed his claim on May 29, 2001, alleging disability as of June 15, 2000. The claims were denied initially and upon reconsideration, after which they were considered by the ALJ. The ALJ convened a hearing on December 4, 2002, where he heard testimony from Harvell, who was represented by counsel, and a vocational expert. The ALJ also reviewed the evidence in Harvell's file.

*Medical Evidence*

After the car crash that caused his injuries, Harvell was treated at a hospital and later at the Rehabilitation Institute of Chicago ("RIC"). In 1996, when he was 17 years old, Harvell was reevaluated by RIC staff. They noted that Harvell was attending high school where he studied in a learning-disabled classroom. His primary deficits were in the areas of memory, concentration, and new learning. A neuropsychological evaluation revealed a verbal IQ of 82, a performance IQ of 78 and a full-scale IQ of 79 on the Wechsler Adult Intelligence Scale - Revised. The pattern of subtest scores was consistent with traumatic brain injury, and Harvell met the diagnostic criteria for a developmental reading disorder. In achievement testing, his grade equivalents ranged from fourth to seventh grade, which were four to seven years behind his current grade level.

After filing his May 2001 disability claim, Harvell underwent a psychiatric consultative examination with Susan Fredriksen, M.D. ("Fredriksen"). Harvell told Fredriksen that he had worked as a dishwasher from January to March 2001, working about 16 hours each week. He reported memory problems and slow thinking. He denied using alcohol or drugs or having mood, anxiety or psychotic symptoms. He stated that he slept well and that his appetite was good. At the time, Harvell was living with his foster mother and two younger foster brothers.

He sometimes washed dishes and made his bed. He watched television and went to movies and occasionally played video games. Harvell stated that he had no close friends and that on Sundays he attended church with his foster mother. Fredriksen found Harvell alert and cooperative and adequately dressed and groomed. His mood was subdued but otherwise unremarkable. He had some spontaneous speech but mostly answered the questions posed to him. He was oriented and displayed good short-term memory and the ability to do mental arithmetic.

Fredriksen diagnosed cognitive disorder secondary to traumatic brain injury. She concluded that Harvell's ability to comprehend instructions appeared to be limited to concrete tasks. His ability to maintain attention and concentration and recall instructions was mildly and at times moderately impaired. His ability to initiate and sustain complete tasks was also mildly to moderately impaired. His ability to relate to co-workers was essentially intact, but his ability to withstand the usual work pressures was moderately to markedly impaired. Fredriksen concluded that Harvell was not capable of managing any funds awarded to him.

On the same day, Dominic Gaziano, M.D. ("Gaziano") performed a consultative examination on Harvell. He observed that Harvell was able to walk 50 feet without assistance, though he walked slowly and with short steps, and that Harvell was unable to "toe walk." Gaziano concluded that Harvell had residual left upper extremity and lower extremity weakness and a limited range of motion of the lumbrosacral spine, but no sensory deficits, dexterity difficulties, atrophy or difficulty carrying or lifting.

On September 10, 2001, Harvell underwent a psychological evaluation with Bridget Stafford, Ph.D. ("Stafford"). This testing revealed slow thinking processes, though Harvell could learn and recall information. Stafford noted that it was difficult for Harvell to maintain his

attention and concentration for a long time. His visual processing was impaired and his reproduction of symbols from memory was mildly to moderately impaired. Stafford diagnosed cognitive disorder secondary to traumatic brain injury with weakness and limping on his left side. She concluded that Harvell could not manage his own funds if he were awarded them.

On January 29, 2002, Puliyodil Philip, M.D., Harvell's treating physician, completed a medical questionnaire at the request of the state. Philip specializes in medicine and rehabilitation. Philip stated that Harvell's IQ testing in June 2001 yielded a verbal IQ of 80, a performance IQ of 67, and a full-scale IQ of 72. All of these scores were lower than Harvell's 1996 test. Philip concluded that Harvell's low IQ, his fair ability to relate to others and his reduced memory, comprehension and judgment precluded gainful employment. At the hearing, Harvell's counsel sought leave to supplement the record with the full report of the neuropsychological evaluation conducted several months earlier. The ALJ gave counsel leave to file the report within a week. It appears that the report was not filed until the ALJ's adverse decision was appealed.

Finally, state agency psychologists and a state agency psychiatrist reviewed the medical record. They opined that Harvell had the functional capacity to perform simple, routine tasks on a sustained basis. They also concluded that he would have mild restrictions in the activities of daily living, mild difficulties maintaining social functioning and moderate difficulties maintaining concentration, persistence or pace and would have no episodes of decompensation.

*Harvell's Testimony*

On August 11, 2001, Harvell completed a questionnaire regarding his daily activities. He stated that he lived at home with his mother. He was able to clean, vacuum, iron and do laundry

4

and yard work. He went shopping once a week. Harvell indicated that he did not need help remembering appointments and that he did not experience difficulty completing tasks. However, he also stated that he was forgetful, and as an example offered that he forgot where he put things. He also noted that he got along well with others, attended church and played basketball. He indicated that he read and had applied to Robert Morris College.

On December 4, 2002, Harvell testified before the ALJ. He stated that it would take him more than an hour to read a page of the newspaper, described his memory as "bad," and indicated that he forgot to do things like make his bed and wash his clothes. He also testified that he has numbness in his feet, the left side of his back and his left arm and that he has pain in his lower back. He explained that he could not stand for more than a few minutes because of weakness in his legs, though he thought he could walk a block with his cane. He claimed to experience weakness in his left arm and said that carrying things such as a gallon of milk was difficult. He also stated that he experiences wheezing in his chest and has migraine headaches. Harvell described episodes (as recounted to him by others) in which he appears to go "off into space" and fails to speak or interact with others. He believes that these episodes last for minutes and occur two to three times each week.

Harvell testified that his foster mother does all of the cooking, cleaning, bills and laundry while he stays in bed most of the day, watching television and falling asleep. He explained that he never takes the bus alone and that someone travels with him or drives him to appointments because he cannot find his way around Chicago.[2] With respect to his job history, Harvell

---

[2]During his examinations with Fredriksen and Stafford, Harvell indicated that he had arrived at the appointment via public transportation. He did not say if anyone traveled with him, but said that he got lost on the way to his appointment with Fredriksen.

testified that he had worked as a dishwasher at a fast-food restaurant but was laid off. He had also worked as a bagger in a grocery store, but quit that job, and had worked putting tree limbs through a chipper for six months but lost that job (allegedly due to marijuana use). Harvell had also worked seasonally as a clothing straightener and in construction cleanup through a labor pool.

***Testimony of Vocational Expert***

A vocational expert, Edward P. Steffen, also testified at Harvell's hearing. Asked to consider a person of Harvell's age, education and past relevant work experience who had borderline intellectual functioning limiting him to simple work requiring no more than one- to three-step operations, Steffen testified that this person could perform Harvell's past work as a janitor, hand-packager, bagger and dishwasher. When the ALJ added the further limitations of "reduced memory, comprehension or judgment" as demonstrated by the inability to travel alone or independently or to pay bills, the vocational expert testified that those types of inabilities would preclude all of Harvell's previous positions and employment as a whole. On further questioning, he explained that these cognitive limitations were inconsistent with Harvell's previous work history.

Presented next with the hypothetical of an individual with borderline intellectual functioning (but without the cognitive restrictions of reduced memory, comprehension and judgment) and lacking functional use of the left side of his body and the need for a cane to walk, the expert opined that the individual would not lose the ability to do all of the work done by Harvell in the past. In other words, positions such as bagging groceries, washing dishes or stuffing newspapers could accommodate the limitation of one-side hemipheresis and borderline

intellectual functioning. Steffen opined that if the reduced memory, comprehension or judgment limitation was added to this hypothetical scenario, no employment would be available.

*Legal Standards*

Section 205(g) of the Social Security Act grants federal courts the authority to review final decisions of the Commissioner with the power to affirm, modify or reverse the decision with or without an order to remand to the Commissioner for a rehearing. 42 U.S.C. § 405(g). In reviewing the final decision of the Commissioner, I must accept as conclusive the findings of fact made by the ALJ if they are supported by substantial evidence. *Id*. "Although a mere scintilla of proof will not suffice to uphold the [Commissioner's] findings, the standard of substantial evidence requires no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (internal quotations and citation omitted). If the record contains such support, I must affirm the decision of the Commissioner unless she made an error of law. *Veal v. Bowen*, 833 F.2d 693, 696 (7th Cir. 1987). I may not re-weigh the evidence, re-evaluate the facts or substitute my own judgment in determining whether a claimant is or is not disabled. *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Nor may I reconsider the ALJ's credibility determinations. *Prince v. Sullivan*, 933 F.2d 598, 601-02 (7th Cir. 1991).

The parties agree that Harvell's disability claim was subject to 20 C.F.R. Pt. 404, App. 1, Subpt. P, Listing 12.02 (hereinafter "Listing 12.02"). Listing 12.02 can be satisfied in one of two ways. A claimant satisfies the listing if he has:

> A. Demonstration of loss of specific cognitive abilities or affective changes and the medically documented presence of disorientation to time and place; memory impairment; hallucinations; change in personality; disturbance in mood; or emotional ability; or loss of

measured intellectual ability of at least 15 IQ points from
premorbid levels; <u>and</u>
B. Resulting in at least two of the following:
1. Marked restrictions of activities of daily living;
or
2. Marked difficulties in maintaining social
functioning;
3. Marked difficulties in maintaining concentration,
persistence or pace;
4. Repeated episodes of decompensation, each of
extended duration.

Alternatively, a claimant can satisfy listing 12.02 under the "C" criteria, which require a medically documented history of chronic organic mental disorder of at least two years duration that has caused more than a minimal limitation in the ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support and one of the following:

1. Repeated episodes of decompensation each of extended
duration; or
2. A residual disease process that has resulted in such marginal
adjustment that even a minimal increase in mental demands or
change in the environment would be predicted to cause the
individual to decompensate; or
3. Current history of 1 or more years' inability to function outside
a highly supportive living arrangement with an indication of
continued need for such an arrangement.

***The Disability Determination***

The ALJ evaluated Harvell under Listing 12.02 and concluded that he failed to meet the "A," "B," and "C" criteria.[3] With respect to the "A" criteria, the ALJ found that Harvell could

---

[3] The ALJ observed that the IQ score of 67 found in Philip's report met the threshold criteria for the Section 12.05 "C" and "D" listings, which address mental retardation. The ALJ chose not to find a disability on this ground because Harvell was diagnosed with cognitive deficits as a result of brain injury rather than mental retardation. He also discounted the IQ score of 67 as it was "significantly" different from other tests and was "inconsistent with [Harvell]'s

not satisfy any of the criteria, including memory impairment.[4] The ALJ also ruled that Harvell

---

demonstrated ability to work at the substantial gainful activity level for an extended period of approximately one year." Although the latter observation is not supported by substantial evidence, Harvell did not object to this conclusion in his motion for summary judgment. The former conclusion is more problematic.

At the hearing, Harvell's attorney sought leave to introduce a neuropsychological report that may have better explained the basis for the low IQ score, or even possibly explained the difference between that IQ score and the scores obtained during a prior test. The ALJ gave counsel leave to file the report, but suggested that he would give the report little weight, as it preceded the physician's January 2002 conclusions. However, counsel's argument was that the 2001 report would more fully explain the 2002 conclusions. In this sense, the record was not fully developed. Counsel nevertheless failed to submit the report within the seven-day period provided by the ALJ, and although counsel objects to the ALJ's failure to consider this information, she does not explain the reasons for her default. Therefore, the failure to fully develop the record falls on Harvell. That error, however, does not excuse the ALJ's rejection of the IQ score of 67 solely because it was "significantly" different than the other IQ score.

Regulations suggest that the ALJ's review of the underlying report was necessary, particularly as IQ scores can vary for many reasons and across may different tests. See Part 4, Subpart P, Appendix 1 at 12.00D6a-c. The ALJ referred to the inconsistency between the low score of 67 and prior IQ scores, but the record contains only one other set of scores, which makes the score of 67 merely different from, rather than inconsistent with, another score. It is difficult to defend choosing the earlier, higher score over the later, lower score if there are only two on record. Although it appears that IQ tests were performed at a single institution, there are no facts to establish either consistent methodology or scoring. This calls into question the ALJ's compliance with 404.1512, which requires the agency to develop fully the medical record.

The ALJ's analysis with respect to 12.05 is also puzzling. The ALJ found that 12.05 was not applicable because the cognitive deficits were due to brain injury rather than mental retardation. I do not think that each of the mental impairment categories under 12.00 are mutually exclusive, an assumption that appears to have been the basis for the ALJ's ruling. Moreover, under 12.05, the IQ score of 67 would satisfy one criteria and along with a significant work-related limitation of function would mean Harvell was disabled except for the period where he had Substantial Gainful Activity.

It may well be that a more thorough investigation would have shown that the 67 IQ was an outlier and this may be the reason that Harvell chose not to press the point about 12.05. Alternatively, Harvell may have believed that it was futile to seek 12.05 relief because of the organic nature of the impairment. Nevertheless, I find that Harvell failed to adequately raise these issues whether before the ALJ or in his briefs to this Court, and I will not remand on this basis.

[4]Harvell argues that the ALJ applied the wrong standard for the "A" criteria, and improperly required Harvell to satisfy each requirement. However, the ALJ found that Harvell could satisfy "none" of the criteria, which is consistent with the regulation's language. I do agree that the ALJ did not make a proper finding with respect to the "A" criteria, which require a

9

could not satisfy the "B" criteria, as his "extensive activities" demonstrated that he had only a mild limitation in activities of daily living. The Judge gave little weight to Harvell's or Philip's opinions that Harvell was unable to work and found that Harvell's past, "extensive [ ]" work history and schooling revealed his actual abilities. He also found that Harvell's testimony lacked credibility because the work history Harvell provided in his written report was inconsistent with (and incomplete in light of) his testimony at the December hearing. Finally, the ALJ found that Harvell could not satisfy the "C" criteria of Listing 12.02.

Harvell first argues that the ALJ failed to give appropriate weight to the opinions of the treating and examining physicians. A treating physician's opinion is only entitled to controlling weight when it is supported by objective medical evidence and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(3). If a treating physician's opinion is not given controlling weight, the ALJ must decide how much weight to assign the opinion based on several factors: the length and nature of the treatment, the support for the opinion, the consistency of the opinion with the record, the specialization of the treating source and other factors brought to the ALJ's attention. 20 C.F.R. §§ 404.1527(d)(1)-(6) and 416.927(d)(1)-(6). When there is a conflict between the opinions of the treating and consulting physicians, "the ALJ must take into account the treating physician's ability to observe the claimant over a longer period." *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985). "[I]n the end, 'it is up to the ALJ to decide which doctor to believe . . . subject only to the requirement

---

demonstration of a loss of specific cognitive activities and medically documented persistence of memory loss, as all of the consultative psychologists and the treating physician found cognitive disorder or cognitive deficits all of which include memory loss. But this error is of no moment because I find no error in the ALJ's finding that neither the "B" nor "C" criteria were met, and "A" alone does not establish disability.

that the ALJ's decision be supported by substantial evidence.'" *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (quoting *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992)).

It was not unreasonable for the ALJ to conclude that Philip's opinion was inconsistent with the majority of the evidence of record, including Stafford's and Fredriksen's findings. Philip's opinion was not supported by treatment notes, a detailed description of Harvell's condition or other evidence that would support his conclusion that Harvell was unable to work. The ALJ was entitled to assign less weight to Philip's responses to the brief questionnaire than the opinions of the other consulting opinions.[5]

Plaintiff also suggests that the opinions of the examining physicians were "completely ignored." In fact, the record reveals the ALJ's consideration of each physician's report. Harvell's real bone of contention is the ALJ's failure to assign more weight to observations that his memory was impaired, one of the 12.02 "A" factors. However, Stafford's opinion appears to support the ALJ's conclusion. After administering the Wexler memory test, she observed that Harvell could learn and recall information that he heard, though it was difficult for him to maintain attention and concentration for longer times. Fredriksen's conclusion about Harvell's memory is more supportive of his claim of memory loss. She concluded that Harvell's attention, concentration and ability to recall instructions was mild to moderately impaired. Cochran, a consulting physician who reviewed the record, concluded that Harvell exhibited marked limitations in remembering detailed instructions but could do simple, routine tasks. The

---

[5]Harvell also challenges the weight assigned to the consulting physician's determinations because the record does not include their resumes, but he fails to point to any authority suggesting that the lack of a detailed resume renders a consulting physician's opinion invalid.

transcripts of Harvell's testimony before the ALJ suggest an impaired memory; but only the ALJ was in a position to evaluate the trustworthiness of that testimony.

In sum, there was some evidence to support a conclusion that Harvell had a memory impairment. It is unfortunate that the ALJ did not address the basis for his conclusion that Harvell did not suffer from memory impairment. However, the hypothetical questions that he posed when questioning the vocational expert recognized both Fredriksen's and Cochran's observations that Harvell struggled with detailed instructions and complicated tasks. In light of the physician reports, none of which observed memory impairment beyond a mild to moderate limitation in the ability to recall instructions, I cannot say that ALJ's finding was not supported by substantial evidence.

Harvell also challenges the ALJ's ruling that he could not satisfy the "B" criteria of Listing 12.02. The ALJ concluded that Harvell had only mild limitations in the activities of daily living and in social functioning in view of Harvell's "extensive" activities. He also observed that Harvell's ability to watch television and his "recent sustained work activity suggest that he has at most moderate difficulty in maintaining concentration, persistence, and pace." The ALJ found no evidence of extended decompensation during the period relevant to his decision, though he did not specify what this period encompassed.

Those observations are generally consistent with the conclusions of Stafford and Cochran (the examining psychologist and the state agency medical consultant, respectively.) They are less consistent with the conclusion of Fredriksen, who found Harvell to be mildly to moderately impaired in his ability to maintain concentration and sustain tasks, but who also found that his ability to relate to co-workers and supervisors was intact. More significantly, Fredriksen found Harvell "moderate to markedly impaired" in his ability to withstand usual work pressures.

Furthermore, as Harvell notes, both Fredriksen and Stafford concluded that Harvell would not be capable of managing any funds awarded him.

The ALJ's determination of Harvell's status under the "B" criteria is problematic. Not only did he disregard both Fredriksen's and Stafford's conclusion that Harvell could not manage any funds awarded to him, he failed to address Fredriksen's conclusion that Harvell was at worst markedly impaired in his ability to withstand usual work pressures. The Commissioner argues–without support–that this single conclusion by Fredriksen (on whose opinion both the Commissioner and the ALJ otherwise relied) was "unsupported by the record." In fact, it is a logical extension of her earlier observations of Harvell's limitations with respect to memory and concentration.

Moreover, the ALJ's conclusion that Harvell's work history is "extensive" is not born out by the record. A summary of Harvell's earnings shows that he earned between $500 and $5,000 every year between 1995 and 2002, with the exception of 2000, in which he earned approximately $8,500. At the hearing, the Judge focused on the $8,000 in earnings in 2000 and Harvell's incomplete explanation of the various jobs he held that year and others. Whether or not Harvell's testimony about that work was credible, his work history demonstrates scattered, short-term employment among several different employers (a fact not contested by the Commissioner.) Varied, short-term work experiences are of a different nature than the "extensive" work experience found by the ALJ. These brief periods of employment may indicate, as Fredriksen predicted, a marked impairment in Harvell's ability to withstand work pressures. This is not diminished by the fact that in some employment situations Harvell chose to leave his position.

On the other hand, the record as a whole demonstrates that Harvell was able, at least for some periods of time, to sustain the pressures associated with positions such as janitorial work or

13

dishwashing. Harvell testified that he was not fired from these jobs for failing to perform them well. It was not entirely unreasonable for the ALJ to conclude, on the basis of the record, that Harvell was only moderately, as opposed to markedly, impaired in his ability to withstand normal work pressures - a finding consistent with the conservative end of Fredriksen's observations.

In sum, while Harvell raises genuine concerns about the ALJ's analysis of the "B" criteria, it is not enough to merit remand. Listing 12.02 requires an affirmative finding under both the "A" and the "B" criteria. Even if the ALJ's finding with respect to the "B" criteria was not supported by substantial evidence, he reasonably found that Harvell could not satisfy the "A" criteria.

The ALJ also concluded that Harvell could not satisfy the "C" criteria of Listing 12.02. This conclusion was substantially supported by the evidence in Harvell's file. Harvell did not present evidence of decompensation for extended periods; rather, his work history was erratic. Additionally, the record demonstrates that Harvell was able to move from Chicago, to his mother's home in Tennessee and back to Chicago while maintaining some (though erratic) employment. Although the record does not show the "extensive" daily activities the Judge found, there is evidence that Harvell was able to respond to changes in his environment. Finally, there was no evidence that Harvell, who lives with his foster mother, would be unable to function outside of the highly supportive living arrangements that Listing 12.02(C)(3) requires.[6]

---

[6] In his brief, Harvell suggests that he can function only in the highly supportive environment provided by his foster mother. Yet his own testimony demonstrated his ability to travel from Chicago to Tennessee to live with his birth mother, whose care was not described in any detail such that it might constitute a "highly supportive" environment.

*The Residual Functional Capacity Analysis*

The ALJ next considered whether Harvell had the residual functional capacity ("RFC")[7] to perform any past, relevant work. He noted that Harvell underwent extensive physical therapy following his brain injury but had not had physical therapy or other treatment in recent years aside from annual visits with Philip, his treating physician. The ALJ also reviewed Gaziano's report, which included Harvell's complaints of weakness, his walking ability and normal reflexes, and Harvell's testimony at the hearing, in which he complained of ongoing physical limitations. The ALJ again found Harvell's testimony about his physical limitations to be "exaggerated and unreliable" and questioned Harvell's credibility. He concluded that the medical findings were "generally normal or only mildly abnormal"[8] and determined that Harvell's recent past work was consistent with a medium level of exertion and that a "medium residual functional capacity" was consistent with the findings of the state agency consultants.

Harvell challenges the ALJ's conclusion that he had the RFC to perform medium work that did not require the performance of more than simple, one- and two-step tasks. Harvell first argues that the ALJ improperly relied only on the state agency physicians' opinions in reaching this determination. However, the ALJ did not rely solely on the opinions of the state agency

---

[7]RFC is the most a claimant can still do despite her physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1). When determining a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence" including medical source statements and descriptions from the claimant and others about what the claimant can still do. C.F.R. §§ 404.1545(a)(3) and 416.945(a)(3).

[8]This comment, if read to encompass both Harvell's physical and mental impairments, would lack substantial support in the evidence. However, given the ALJ's earlier conclusion that Harvell suffered from an organic mental disorder, I find that this comment refers solely to Harvell's physical abilities.

physicians. Rather, he reviewed and weighed the evidence of record, both medical and non-medical, and the credibility of Harvell's complaints.

Harvell's self-described physical limitations are the primary basis for his objection to the RFC analysis. For example, he relies on his own complaint that he cannot lift as evidence that the limitations imposed by the ALJ were not sufficient. The ALJ was not required to find Harvell's description of his physical limitations controlling. Harvell's reliance on Gaziano's opinion to support his claim that he cannot perform medium work is also misplaced. Gaziano found that despite residual left upper extremity and lower extremity weakness, Harvell had no difficulty carrying or lifting. Gaziano observed that Harvell walked slowly but without difficulty (though he could not "toe walk") and had no sensory deficits or atrophy.

Harvell also challenges–more reasonably–the opinions of the state agency professionals who reviewed his records. At least two lacked any training in a specialization relevant to Harvell's impairment: one of the agency physicians was board certified in obstetrics and gynecology, and the other was board certified in pediatrics. Neither possessed any specialization in traumatic brain injuries or neurological disorders. This lack of expertise in the relevant field is certainly cause for concern. Nevertheless, state agency physicians are considered experts in Social Security disability program evaluation, and their opinions must be considered by the ALJ. *See* 20 C.F.R. §§ 404.1527(f)(2)(I) and 416.1527(f)(2)(K). More importantly, the ALJ's opinion does not rely solely on these two physicians' analyses of the medical record, but on his review of the entire medical record and the non-medical evidence before him.

Finally, Harvell argues that the RFC analysis fails to account for Fredriksen's conclusion that he was moderately impaired in his ability to withstand usual work pressures. Although the ALJ did not discuss this specific finding in his RFC analysis, this finding (alone or in

16

combination with the other evidence) would not be sufficient to undermine the ALJ's conclusion. It was not unreasonable for the ALJ to conclude that Harvell was capable of securing and maintaining work similar to the work he had performed in the recent past, albeit for brief and temporary periods.

In closing, I note that this might be a case in which the claimant would be wise to make another attempt. There is another way to present this claim, and one must bear in mind that the Substantial Gainful Activity, which the ALJ found to "appear[ ]" in this case, was work that earned $8,506.11 in one year and only one year. This is a mere $106.11 above the threshold of $8,400, and it is not clear that the earned amount was reduced by impairment-related work expenses such as medications.

For these reasons, Plaintiff's Motion for Summary Judgment is DENIED. Defendant's Motion for Summary Judgment is GRANTED.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: September 20, 2006